**RECEIVED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JAN 0 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

YOLANDA C. GIBSON-MICHAELS )
     Plaintiff, )
     )
     )
    v. ) Civil Action No.**1:06CV01938**
     )
SECURIGUARD INC, et.al. )
    Defendants )

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS

    COMES NOW, Yolanda C. Gibson-Michaels (prose), Plaintiff in the above-entitled action, and files an Opposition to Defendant's Motion to Dismiss by and through counsel. As ground for this Motion, and support hereof, Plaintiff states the following:

## I.    JURISDICTION AND VENUE

    This Court has both subject matter jurisdiction over this action and personal jurisdiction over Plaintiffs' claims pursuant to Electronic Communication Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848, Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. III, §§ 801–804, 82 Stat. 211, 9-7.100 Authorization of Applications for Wire, Oral, and Electronic Interception Orders; Privacy Act, 5 U.S.C. § 552a.

## II.    DEFENDANTS' MOTION TO DISMISS IS MOOT

    A motion to dismiss under Rule 12(b) (6) should be granted only if it appears beyond doubt that "no relief could be granted under any set of facts that could be proved consistent with the allegations." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249-50 (1989).

1.

Courts have ruled that the issue on a motion to dismiss "is not whether . . . plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims in which all allegations within her Complaint must be taken as true. See Scheuer, 416 U.S. at 236.

Plaintiffs' complaint provides sufficient information to entitle her to pursue claims. Respectfully, Defendants' Motion to Dismiss must be denied to allow Plaintiff's constitutional right to pursue her claims the discovery phase.

Plaintiff has more than sufficiently demonstrated that her claims under the Administrative Procedure Act, 5 U.S.C. § 702 et seq. ("APA"), the Fifth Amendment to the United States Constitution and her assertion of a constitutional right to privacy, all survive.

## III.    **BACKGROUND**

Defendant Douglas R. Fahey (unlicensed) (hereafter "Fahey") and all named Defendants and co-conspirators maliciously with intent engaged into the use of Douglas R. Fahey's falsified credentials while **acting under the color of law** by which Fahey negligently by and through his conducted, violated Plaintiff's right to religious free speech, age, race, and constitutional rights as guaranteed by the First Amendment of the United States Constitution.

Fahey (unlicensed) investigator is a former contract employee simultaneously employed, paid, and contracted with Securiguard, Inc. and USEC Service Corporation contracts  while employed at the Federal Deposit Insurance Corporation (hereafter "FDIC) under purchase order P.O. 0300303 Effective Date 9/3/03.   Securiguard is also registered as a **Foreign Profit Corporation** under CT Corporation System FEI Number 541189694 filed on 6/20/2005. **(See Tab 1)**

Both contracts were only authorized by the General Services Administration
(GSA) to provide **Security Guard Services** at the Federal Deposit Insurance Corporation
(FDIC) in the District of Columbia and Virginia.

USEC Corporation is the prime contractor operating under a subcontract with
Securiguard.  Securigaurd was incorporated in the Commonwealth of Virginia in January
1982. Patricia DeL. Marvil is Chairman/CEO and Secretary and David L. Marvil, CPP, is
President and Treasurer.  The Corporate headquarters of Securiguard is located at 6858
Old Dominion Drive, Suite 307, McLean, Virginia 22101.

Securiguard and USEC Corporation alias **Commerce Funding Corporation** (hereafter
**"CFC"**) is registered as doing business as a **Commerce Funding Services** confirmed by
the General Services Administration (GSA) as operating under the a task order work
number **99-00086-C-J3** not a contract.

FDIC insured **Security One Banks'** profile of Ms. Del Marvil states, in part, that:
"Securiguard's CEO Patricia Del Marvil founder and owner of Securiguard, Inc., have
over 30 years experience in security and criminal justice. Over the past 23 years, Ms.
Marvil has successfully developed Securiguard into a multi-million dollar corporation.
Ms. Marvil has simultaneously served on the board of multiple business organizations,
and has assisted Northern Virginia in the development of new business. The Governor of
Virginia has appointed her to commissions and boards for the development of special
programs for the Commonwealth of Virginia."

## IV.    **INDEMNIFICATION**

Defendant attempt to recluse himself from his negligence actions, defamation of Plaintiff character, Title VII, due process, and constitutional protections afforded to Plaintiff. Defendant's contractual Indemnification agreements, license requirements, warrants, bonds, certifications are clearly articulated in both Securiguard and USEC Corporation contractual agreement with the Federal Deposit Insurance Corporation, under Article XI. Indemnification, page 16 of the USEC Corporation contract (attached herein) clear states, in part, that:

> "Contractor agrees to indemnify, **Hold Harmless**, and **Defend** the **FDIC** **in all of its capacities**, and **all of its officers**, **directors**, and **employees** against any and all claims, losses, penalties, fines, forfeitures, amounts paid in settlement, judgments, reasonable attorneys' fees and related litigation, costs, fees, expenses which result from any act or omission constituting **negligence, willful misconduct** or **breach of fiduciary duty by any officer**, **director**, **agents** or employees of Contractor or its subcontractors in connection with Contractor's performance under this contract."

Plaintiff's complaint clearly provided evidence that Douglas R. Fahey did not have a licensed, was paid under both Securiguard and USEC Coproation contracts, and violated Articles I, VII, Scope, suitability, standards of conduct to and including other articles under the Securiguard contract. (**See Tab 2**)

4

Plaintiff provided evidence throughout her complaint confirmed by sworn FDIC of James T. Lantelme, Assistant Director, which he stated, in part, that:

> **"I am unaware who informed Ms. Gibson-Michaels that she was the subject of an administrative investigation.  To the best of my knowledge the resultant investigation was <u>conducted by investigator Fahey</u> and Mr. Kmentz.  <u>I was not involved in the resultant investigation or the investigative decisions made by Investigator Fahey</u> and Ms. Kmentz"**

FDIC official William Kmentz clearly stated by sworn affidavit, in part, that:

> **<u>"Mr. Fahey was a contract investigator with the Securiguard Corporation.  Mr. Fahey was in charge of investigation.  Mr. Fahey conducted interviews in connection with the allege threat investigation.</u>**

Jenekia J. Johnson stated on page 3 of 5 of her sworn affidavit that: "During the morning of April 15, 2004, **<u>I was interviewed by Investigator Fahey</u>** about the theft and my conversations with Ms. Gibson-Michaels.  **<u>He asked me to take a hidden electronic recorder with me and engage in a conversation with Ms. Gibson-Michaels about her threats to me</u>.  <u>He stated that if I did not take a hidden electronic recorder with me when I spoke to Ms. Gibson-Michaels</u>, it would be Ms. Gibson-Michaels' word against mine regarding Ms. Gibson-Michaels' threats.**" Federal law makes it a crime to intentionally intercept, attempt to intercept or have someone else intercept on one's behalf any wire, oral, or electronic communication. 18 U.S.C. Section 119.  Jenekia J. Johnson confirmed that Douglas R. Fahey procured her to intercept Plaintiff's oral communication.

Thus Fahey, Johnson and the FDIC were negligent and liable to Plaintiff for damages as a direct result of Douglas R. Fahey's malicious, intent, and gross misconduct.

FDIC Randi L. Mendolsohn stated on page 2 of 5 of her sworn affidavit that: **"Based upon Mr. Fahey's assurances that the use of the secret electronic recorder was legal, I stated, in substance, that from a Human Resources viewpoint, that I did not see any objections regarding the use of the secret electronic recorder in the investigation." (See Tab 3)**

FDICs EEO investigator Barry Cohen provided evidence that Douglas R. Fahey was not employed by Securiguard. Metropolitan Police provided evidence that Fahey was unlicensed. DOJ criminal Division provided evidence that Fahey did not have a court order to engage into a warrantless interception of Plaintiff's oral communication, and FDIC William (Bill) Kmentz confirmed that Fahey refused to speak to EEO investigator Barry Cohen unless he was paid by compensation for his time.

Plaintiff provided evidence to FDIC and the unlicensed contract employee Douglas R. Fahey that Jenekia Johnson confirmed that Plaintiff quoted a bible verse inside a closed door office. Johnson stated on page 18 of the bogus investigative report that: **"saying that things would roll over if nothing happens to me if they would roll over to Jayda which I know I heard plenty of times but it's like I just felt very very threaten…" (See Tab 4)**

Defendants wish to exclude Plaintiff from constitutional protection on the basis that the various precedental decisions analyzing the existence of liberty interests do so primarily in the context of employment cases. See e.g., Roth, 408 U.S. 564; Codd v. Velger, 429 U.S.624 (1977); Doe, 753 F.2d 1092. It is true that the majority of liberty interest cases involve individuals already employed, but there is nothing within the Constitution or the case law that has arisen there from that creates the unnatural schism sought by the defendants. "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." Bolling v. Sharpe, 347 U.S. 497, 499-500; Roth, 408 U.S. at 572.

Plaintiff is entitled to due process and make whole remedies to correct damages to her reputation, future job offers in the wake of allegations that Defendants lied, falsely accused and portrayed Plaintiff as a "Threat" See Reeve Aleutian Airways, Inc. v. United States et al., 982 F.2d 594, 598 (D.C.Cir. 1993).

The law is clear that Plaintiff has a liberty interests when an individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, threats, alcoholism, disloyalty, Communism or subversive acts or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities.

Defendant, Douglas R. Fahey by and through his actions maliciously with intent labeled Plaintiff as a "threat" tarnished Plaintiffs former outstanding career, good name, reputation, honor and integrity when he subjective Plaintiff to a bogus investigative interview, made false statements while acting under the color of law.

7

Fahey's conduct is clearly describe under 18 U.S.C. Section 913 - **Impersonator Making Arrest or Search "whoever falsely represents himself to be an officer, agent, or employee of the United States, and in such assumed character arrests or detains any person** or in any manner searches the person, buildings, or other property of any person, shall be fined under the title or imprisoned not more than three years, or both. See also **section 912. Officer or employee of the United States**

Plaintiff's complaint clearly established that Fahey while falsely acting under the color of law failed to exercise a duty of care, abused his authority under his assumed identity of being an officer, investigator, employee with police authority and violated Plaintiff's civil, constitutional, parental, age, race with allegations of false statements, entrapment, harassment, intimidation to and including the fact that Plaintiff was denied right to Counsel; and detained Plaintiff against her will for well over 3 hours.

Courts have ruled that liability for negligence takes place when there is:

1.  A duty or obligation or care which requires a certain standard of conduct;

2.  A failure to conform to that standard of conduct;

3.  A reasonable causal connection between the failure to conform to that standard of conduct and

4.  An actual loss or injury.

8

## V.    **ARGUMENT**

"A motion to dismiss for failure to state a claim upon which relief can be granted is generally viewed with disfavor and rarely granted." Doe v. United States Dept. of Justice, 753 F.2d 1092, 1102 (D.C.Cir. 1985).

For the purposes of such a motion, the facts alleged in the complaint must be accepted as true, and all factual inferences, ambiguities or doubts concerning the sufficiency of a claim are to be drawn in the plaintiff's favor. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1979) 753 F.2d at 1102.

The plaintiffs' prospects for retirement, employment, and reinstatement into the Federal Government after 25 years of sustained outstanding Federal services since 1981 have been irreparably harmed because of the defendants' malicious and outrageous conduct and actions while falsely acting under the color of law.  Defendants' tactics were Orwellian in nature, unconstitutional, impermissible by statute and not in accordance to the rules of law.

## VI.    **DUE PROCESS CLAUSE**

The Due Process Clause of the Fifth Amendment forbids the federal government from depriving persons of "life, liberty, or property, without due process of law." "'Liberty' and 'property' are broad and majestic terms. They are among the '[g]reat [constitutional] concepts ... purposely left to gather meaning from experience....[T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged." Board of Regents v. Roth, 408 U.S. 564, 571 (1971).

The types of 'liberty' and 'property' protected by the Due Process Clause vary widely, and what may be required under that Clause in dealing with one set of interests which it protects may not be required in dealing with another set of interests." Arnett et al. v. Kennedy et al., 416 U.S. 134, 155 (1974).

The Supreme Court has emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government and private parties." County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 1716 (1998)(citation omitted). See also Collins v. Harker Heights, 503 U.S. 115, 126 (1992)(noting that the Due Process Clause was intended to prevent government officials "'from abusing [their] power, or employing it as an instrument of oppression'")(citation omitted). This is so "whether the fault lies in a denial of fundamental procedural fairness" or "in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." See Lewis, 118 S.Ct. at 1716.

The Supreme Court's decision in Jenkins v. McKeithen, 395 U.S. 411 (1969) recognized that the public branding of an individual implicates either "liberty" or "property" interests, or that neither can be achieved by the government without following certain procedural safeguards to ensure the elimination of arbitrary or capricious actions.

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to her by use of a 3rd party contractor, notice and an opportunity to be heard are essential." Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971).

The language above stems from the evolution centuries of holdings from our nation's highest court. The defendants would have this Court unjustly destroy the development of constitutional protections for individuals who have sought to do nothing more than devote their loyalties and service to the federal government. The defendants wish for this Court to isolate named defendants and rule that constitutional safeguards does not exist or apply to Plaintiff.

Under the defendants' theory, she is not worthy of protection as a prose litigant, Federal employee, individual, afro-American in violation of her age, race, and religion as were slaves prior to the Emancipation Proclamation in 1863. As such, she has no Fifth Amendment protection from the government and named defendants stripping away her liberty interests by branding her as "Threat" based on an innocent quotation of a bible verse from the King James Bible inside a 'closed-door' office.

Defendant Douglas Fahey while acting under the color of law denied Plaintiff due process protection, collected information, denied Plaintiff counsel, disseminating malicious accusations to the Workforce Violence Institute CEO Steve Kaufer to and including throughout the Securiguard and USEC 3rd party contractor security guard employees, and willfully caused Plaintiff's picture, personal family members medical information; and Plaintiff's severely autistic son's medical information to be disseminated, circulated, and permanently entered into the FDICs, Seuriguard, and USECs computerized data base.

Defendant imposed a stigma upon Plaintiff that will foreclose future employment opportunities by having placed derogatory information regarding the investigative interview, interception of Plaintiff's oral communication, privacy, unauthorized released of intercepted communication ('tape recording') to the Workforce Violence Institute (3rd party contractor).

Furthermore, plaintiff is required to or will reveal the information as she proceeds through the hiring process which requires declarations of information provided regarding past employment.

Such a deprivation of liberty has been recognized not only where the individual is employed by the state, but where she seeks employment with the Federal, State, and local private or federal agencies. See Waltentas v. Lipper, 636 F.Supp. 331, 337 (S.D.N.Y. 1986), 862 F.2d 414, 421 (2d Cir. 1988). In so ruling, Waltentas relied upon Doe v. United States Civil Serv. Com'n, 483 F.Supp. 539 (S.D.N.Y. 1980), where the plaintiff had been denied a White House fellowship because the defendant had recorded and included false and derogatory statements about her in her file, thus making them a basis for the hiring decision, without affording her the opportunity to refute them.

The Supreme Court decisions concerning the constitutional prohibition against government defamation to and including by third parties (contractors) does not alter or extinguish a right or status previously recognized by state law," id, citing Paul, 424 U.S. at 711, and the "government ['s] action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity." See Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 898 (1961). See also Carmi v. Metropolitan St. Louis Sewer District, 620 F.2d 672 (8th Cir)

12

The factual distinction between an employee and an applicant is irrelevant for the purposes of determining a constitutional liberty interest based on the analysis of the Supreme Court's guidance in Codd, Bishop and Roth.

It is well noted that a liberty interest protected by the Due Process Clause prohibits the government from depriving an individual of government employment on the basis of false charges and then aggravating the injury, and further diminishing employment opportunities, by tarnishing the individual's name and reputation. Waltentas, 636 F.Supp. at 337, quoting United States Civil Serv. Com'n, 483 F.Supp. at 570.

Plaintiff established that she has proven impairment of a liberty interest by named defendant's false statements with the filing of evidence in the original complaint. See Codd, 429 U.S. at 627-28, and that the Defendant (unlicensed) and unauthorized collection of evidence, investigative interview, interception of oral communication were made public, thus harming by deprivation of property right, denied due process, good name, reputation, honor, and integrity of Plaintiff. See Bishop, 426 U.S. at 348. Both requirements have been met by the plaintiffs, as detailed throughout her pleadings. Moreover, the D.C. Circuit has outright recognized the "right of a federal job applicant to seek injunctive relief from an agency's violation of his constitutional rights in general." Hubbard v. U.S. E.P.A. Admin., 809 F.2d 1, 11 (D.C.Cir. 1986).

Subsequently, defendants' acting by his own authority contradicts their argument. See Dziewior v. City of Marengo, 715 F.Supp. 1416, 1423 (N.D.Ill 1989)(noting Seventh Circuit in Perry, 759 F.2d 1271, 1276-82 (7th Cir. 1985) recognized liberty interests have been extended to applicants for governmental employment). The remaining cases cited by the defendants set forth the standards for determining whether a liberty interest has been violated, not whether the right exists.

This Court should explicitly hold that applicants possess Fifth Amendment liberty interest protections.

In its most recent pronouncement, the D.C. Court of Appeals has held that deprivation of a protected liberty interest may be shown either through an adverse employment action in "conjunction" with official defamation ("defamation plus"), or through an adverse employment action in "combination" with an automatic or formal exclusion from some category of employment opportunities, or in combination with largely precluding one from pursuing a chosen career or profession ("stigma plus"). O'Donnell  v. Barry, 148 F.3d 1126, 1143-44 (D.C. Cir. 1998), citing Kartseva v. Department of State, 37 F.3d 1524, 1527-29 (D.C.Cir.1994).

Liberty interests arise if an employee is terminated in a manner that **'stigmatizes'** them by impugning their reputations or foreclosing their future employment opportunities," Orange v. District of Columbia, 59 F.3d 1267, 1274 (D.C.Cir. 1995), citing Roth, 408 U.S. at 572-73, or, as explained above, when an applicant is denied employment. See e.g., Larry v. Lawler, 605 F.2d 954, 956 (7th Cir. 1978); Velger v. Cawley, 525 F.2d 334, 336 (2d Cir. 1975), rev'd on other grounds sub nom, Codd v. Velger, 429 U.S. 624 (1977); United States Civil Serv. Com'n, 483 F.Supp. at 570-71.

14

Plaintiffs established that she suffered the loss of a **25 year sustained outstanding Federal Government career**, critical health benefits for her severely autistic son with a seizure disorder, future income, and loss of prospective Federal or private employment due to the defendant's malicious and defamatory allegations that she caused a "Feeling of Threat" during a mere quotation from the Bible inside a closed door office to a 25-year old adult involved in a Federal theft.

The D.C. Circuit has "consistently interpreted Paul's 'stigma plus' test to require two forms of government action before a plaintiff can 'transform a [common law] defamation into a [constitutional] deprivation of liberty.'" Mosrie v. Barry, 718 F.2d 1151, 1161-62 (D.C.Cir. 1983).

First, it is indisputable the defamation originated from defendant Douglas R. Fahey acting under the color of law, failure to exercise a duty of care, use common sense and judgment.

Second, there must be a tangible change of status vis-a-vis the government as a result of the stigma. Since the plaintiffs had her employment offers rescinded to and including suffered an involuntary removal from the Federal Government amid allegations of misconduct (i.e., Quotation of a Bible verse) she has been barred from the FDIC, picture has been placed inside a red security book with orders "DO NOT ENTER", embarrassed, ridiculed, shamed and precluded from re-employment with the FDIC and throughout the Federal Government.

Plaintiff's age, race and the inflammatory malicious defamatory label of causing or being a 'Threat' by named defendants unorthodox investigative interview caused Plaintiff to not overcome the stigma placed upon her but for the willful actions of named Defendant Douglas R. Fahey and Jenekia J. Johnson. Thus, tangible changes of status clearly exist, and the plaintiffs' allegations meet the standards set by this Court.

[T]he principal recent cases from this court in which a government-imposed stigma by its actions or actions of its agents or contractors it was found to have deprived the stigmatized person of a liberty interest involved either loss of employment or foreclosure of a right to be considered for government contracts in common with all other purposes. See Mosrie, 718 F.2d at 1161.

This alone permits the plaintiff to defeat the Defendant's Motion to Dismiss her liberty interest claim. The plaintiffs have clearly asserted that the stigmatizing fact of being labeled as a threat has mentally, physical, and spiritually caused severe damages to Plaintiff.

It does not require Einsteinium intelligence or even a stretch of the imagination to recognize the stigmatizing nature of an applicant failing a required Federal background investigative clearance examination, especially when failure is tantamount to an accusation of being a "Threat" in the workforce which clearly creates an "overwhelming potential for prejudice". Brown v. Darcy, 783 F.2d 1389, 1396 (9th Cir. 1986). Defendant's collection and release of a private intercepted conversation conveyed false impressions among her former colleagues at the Federal Deposit Insurance Corporation (FDIC).

It is well noted that Plaintiff is feature throughout newsletters among the FDICs main office locations and regional offices as an outstanding employee. Plaintiff has been tarnished by Defendant's malicious, reckless, disregard for the truth while acting under the color of law, false credentials, and impersonation of an investigator in which Plaintiff provided clear and convincing evidence that Douglas R. Fahey named defendant was an unlicensed perpetrator and undocumented employee as confirmed by FDICs contract EEO investigator Barry Cohen and USEC Corporation that Fahey was **NOT** employed by Securiguard.

For the purpose of this Motion, the Court must accept these allegations as true. Thus, the conclusory contradictory assertions of the defendants have absolutely no weight.

A threat is defined as "an expression of intention to inflict evil, injury, or damage" A personal discussion of Plaintiff's private life, a quote from the Bible in which **defendant Johnson confirmed she heard plenty of times before** did not give rise to defendant Douglas R. Fahey initiation of an unauthorized interception of Plaintiff's oral communication, investigative interview, 5-day suspension, deprivation of liberty rights, due process, detention for well over 3 hours without counsel, denied Miranda rights and the removal from the United States Federal government.

Defendants should not be permitted to redefine common concepts or words simply to suit its personal and financial interests. The meaning of being label as a 'threat' has been established in an investigative report, tape recorded, disseminated to other 3rd party contractor's i.e, Steve Kaufer CEO of the Workforce Violence Institute, colleague, and associate of Douglas R. Fahey whom are both members of the ASIS Institute.

If an applicant for Federal employment fails a background or polygraph test, i.e., deception is indicated, that person is viewed as a liar or a threat. Either they have told the truth or they have not. If they have not, they have lied.

Plaintiff has presented that these are all factual issues that are totally inappropriate to resolve in an initial **Motion to Dismiss**, especially before any discovery has taken place or a hearing before the district court. Therefore, the defendants' motion to dismiss is meaningless.

Defendant's argument is both legally and factually inaccurate on its face. The Complaint clearly details the stigmatization that has taken place to foreclose employment opportunities against plaintiff with being labeled as a threat.

Plaintiff's complaint has set for several claims sufficient to defeat the defendant's Motion to Dismiss. See Kartseva, 37 F.3d 1524 (D.C.Cir. 1994); See also Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1506 (D.C.Cir. 1995).

The concept of liberty protected by the due process clause has long included occupational liberty - 'the liberty to follow a trade, profession, or other calling.'" Wroblewski v. City of Washburn, 965 F.2d 452, 455 (7th Cir. 1992). Protected liberty interests are implicated "'where government or private contractor's action has operated to bestow [stigma] with an attendant foreclosure from other employment opportunity.'"

The D.C. Circuit endorsed a plaintiff's right to demonstrate to the Court, obviously after discovery, to what extent the stigmatizing reasons for discharge have been conveyed to the public or other government agencies and harmed future employment opportunities.

The public disclosure requirement is met because the defendants have caused Plaintiff to be labeled as a threat, barred from the FDIC, Federal employment; and caused negative defamatory information to be placed within the plaintiffs' employment files; and stored within an electronic database. Plaintiff federal personnel files are available, even on a limited basis, to prospective employers or government officials.

It should be noted that in advancing defenses to a Fifth Amendment argument defendants intentionally omitted a challenge to the plaintiffs' assertions that the defendants will continue to disclose results of the investigative interview to 3rd party security agencies, workforce violence institute, and throughout the FDIC community. See Fed.R.Civ.Proc.R. 12(g). In any event, the law is clear that the **publication requirement** is satisfied due to the fact that the defendants have placed the information within the plaintiffs' files. See e.g. Kartseva, 37 F.3d at 1528 (availability of unfavorable information to future potential government employers constitutes status change of due process import).

## VII.  **PLAINTIFF IS ENTITLED TO DISCOVERY**

Plaintiff has sufficiently demonstrated that the defendants' Motion to Dismiss should be denied, this Court should permit Plaintiff the opportunity to immediately commence discovery. Courts addressing the type of case set forth herein permit plaintiffs to commence discovery as a routine matter. See e.g., O'Donnell, 148 F.3d at 1139; Orange, 59 F.3d at 1275; Kartseva, 37 F.3d at 1530.

Furthermore, because most of the evidence relating to the plaintiffs' claims are "likely to be exclusively in the possession of the government, it would seem appropriate to accord [plaintiffs] the discovery necessary to this issue." Britt v. Naval Investigative Service, 886 F.2d 544, 551 (3d Cir. 1989).

**Wherefore**, Plaintiff has met standards for a decision against a decision under RULE 12(b)(6), MOTION TO DISMISS. It is this Plaintiff's understanding that courts do not in general favor Rule 12(b)(6) MOTIONS TO DISMISS, because the policy of the federal rules is to allow cases to proceed if there is any reasonable chance that the plaintiff is entitled to relief. Thus, the federal courts require the defendants' to make a very strong showing before a complaint may be dismissed for failure to state a claim.

**Wherefore**, a MOTION TO DISMISS, Rule 12(b)(6) motion tests whether, based only on what is said in the complaint, the plaintiff possibly could be entitled to relief. Courts do not determine whether the facts Plaintiff states are true, but instead assume the truth of Plaintiff's factual statements and decide whether Plaintiff may have a claim that could lead to relief.

**Wherefore**, the Ninth Circuit recently stated, when reviewing a Rule 12(b)(6) motion, a federal court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the nonmoving party." See, WARSHAW vs. XOMA, 74 F.3d 955, 957 (9th Cir. 1996).

**Wherefore**, Courts should not dismiss a pro se pleading unless it is absolutely clear that the deficiencies in the pleading cannot be cured by amendment. See, KARIM-PANAHI vs. LOS ANGELES POLICE DEPT., 839 F.2d 621 (9th Cir. 1988). DETERMINING SUFFICIENCY OF COMPLAINT UNDER FEDERAL RULES OF CIVIL PROCEDURE RULE 12(b)(6), MOTION TO DISMISS

**Wherefore**, to survive a MOTION TO DISMISS under Fed. R. Civ. P. 12(b)(6), a complaint need only outline a recognized legal or equitable claim which sufficiently pinpoints the **TIME**, **PLACE**, and **CIRCUMSTANCES** of the alleged occurrence and which, if proven, will justify some form of relief. See, DOROTHY K. WINSTON & CO. vs. TOWN HEIGHTS DEVELOPMENT INC., 376 F. Supp. 1214 (D. DC 1974) later proceeding 68 FRD 431, 21 FR Serv2d 100 (D. DC 1975)

**Whereas**, Plaintiffs has demonstrated that she is legally entitled to proceed with her complaint before this Honorable Court for its consideration prior to any final judgment being issued.

Respectfully submitted,

Yolanda C. Gibson-Michaels (prose)
2210 Anvil Lane
Temple Hills, Maryland  20748
(301) 630-5062

21

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this **5th day of January 2007**, a copy of the

foregoing Plaintiffs' Opposition to Defendants' Motion to Dismiss was mailed by

Regular mailed to named defendants; and delivered by fax. YCG-m A copy was hand-delivered by Night Drop box to the U.S. District Court, Washington, DC @ bar

**Copies to**:

David Zachary Kaufman, Esq.
Kaufman Law Firm, A Professional Corporation
11350 Random Hills Road – Suite 800
Fairfax, Virginia 22030
Counsel for Defendants Securiguard, Inc.
  and USEC Corporation

Scott D. Helsel (D
Walton & Adams, PC
1924 Isaac Newton Square
Reston, Virginia 20190

Shelia C. Bair
Federal Deposit Insurance Corporaiton (FDIC)
550 17th Street, N.W. MB-6029
Washington, D.C. 20429

Kathleen Gunning, Counsel and Tina Lamoreaux, Counsel
Federal Deposit Insurance Corporation (FDIC)
3501 North Fairfax Drive
Arlington, Virginia

Jenekia J. Johnson, Prose Defendant
1414 Colony Road
Oxon Hill, Maryland 20748

Douglas R. Fahey
3716 Dalebrook Drive
Dumfries, Virginia 22015-1804

Patricia Del Marvil
Chairman CEO
Securiguard Incorporation
6858 Old Dominion Drive – Suite 307
McLean, Virginia 22101

22

David L. Marvil
Chairman CEO
USEC Corporation
7531 Leesburg Pike – Suite 402
Falls Church, Virginia  22101

Robert Feldman, Executive Secretary
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C.  20429

Yolanda C. Gibson-Michaels (PNOTE)
2310 Anvil Lane
Temple Mills, MD 20748

23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

YOLANDA C. GIBSON-MICHAELS )
        Plaintiff, )
         )
        v. ) Civil Action No.1:06CV01938
SecuriGuard Inc, et al. )
(Douglas R. Fahey, et.al. ) )
        Defendants )

## ORDER

      It is upon consideration of Plaintiff's Opposition to Defendant Motion to

Dismiss is hereby by Granted on this _____ day of _____, 2006.

      It is further, ORDERED, that Defendant's Motion to Dismiss is Denied.


                             _____
                             Judge


**Copies to**:

David Zachary Kaufman, Esq.
Kaufman Law Firm, A Professional Corporation
11350 Random Hills Road – Suite 800
Fairfax, Virginia 22030
Counsel for Defendants Securiguard, Inc.
  and USEC Corporation

Scott D. Helsel (D
Walton & Adams, PC
1924 Isaac Newton Square
Reston, Virginia 20190

Shelia C. Bair
Federal Deposit Insurance Corporaiton (FDIC)
550 17th Street, N.W. MB-6029
Washington, D.C. 20429

Kathleen Gunning, Counsel and Tina Lamoreaux, Counsel
Federal Deposit Insurance Corporation (FDIC)
3501 North Fairfax Drive
Arlington, Virginia

24

TAB2

**FDIC Security Services Contract**

**Contract No. 99-00086-C-J3**

Version 2.0
November, 1996

# FDIC SECURITY SERVICES

## CONTRACT NO. 99-00086-C-J3

Contract executed on April 16, 1999 ("Execution Date") and effective as of April 25, 1999 ("Effective Date") between the FEDERAL DEPOSIT INSURANCE CORPORATION, acting in its corporate capacity ("FDIC"), and SECURIGUARD, INC., a Corporation organized and existing under the laws of Virginia with its principal place of business at 6858 Old Dominion Drive, Suite 307, McLean, Virginia 22101 ("Contractor").

### WITNESSETH:

The FDIC, in its corporate capacity, desires to retain Contractor, and Contractor desires to perform the services or provide the goods described in this contract ("Contract"), upon the terms and conditions set forth below.

Now, therefore, in consideration of the mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the FDIC and Contractor agree as follows:

## ARTICLE I. APPOINTMENT AND DUTIES OF CONTRACTOR

1.1 Independent Contractor. The FDIC hereby retains Contractor as an independent contractor for the sole purpose of performing the services or providing the goods described in this Contract.

1.2 Duties. Contractor hereby agrees to perform such services (the "Services") or provide such goods (the "Goods") on the terms and conditions set forth below and in the Statement of Work, *Attachment 1* to this Contract which is incorporated herein by reference, and in Contractor's Proposal or Amended Proposal, if any, *Attachment 2* to this Contract which is incorporated herein by reference. *Attachment 3*, entitled "FDIC General Provisions", and *Attachment 4*, entitled "U.S. Department of Labor Wage Determination", is also hereby incorporated into and made a part of this Contract.

1.3 Standard of Performance. Contractor shall at all times act in good faith and in the best interests of the FDIC, use its best efforts and exercise all due care and sound business judgment in performing its duties under this Contract. [ Contractor shall at all times comply with FDIC policies, procedures and directives, which are incorporated by reference and made part of this contract. ]

1.4 Calendar Days. Unless specifically provided otherwise in this Contract, the term "days" used anywhere in this Contract shall mean calendar days.

## ARTICLE VII.  REPRESENTATIONS

7.1    Representations of Contractor.  Contractor represents as follows:

      7.1.1  The execution, delivery and performance of this Contract have been duly authorized by all necessary corporate action of Contractor.

      7.1.2  Contractor currently possesses all necessary licenses, permits and approvals required to execute, deliver and perform its duties under this Contract and is qualified to do business in all jurisdictions where such qualification is required for Contractor's performance of its duties under this Contract.

      7.1.3  At the time of execution of this Contract, there has been no change in any of the Certifications Contractor submitted to the FDIC with its proposal.  Contractor agrees to notify the Contracting Officer immediately, in writing, of any change to Contractor's Certifications.

7.2.    Year 2000 Warranty Contractor warrants that no product or service delivered under this contract will fail to perform as intended by this contract due to the inability of any associated hardware, software or firmware to accurately process, manage or manipulate (including but not limited to, calculating, comparing, and sequencing) date or date related data from, into, and between the twentieth and twenty first centuries, including leap year calculations.  Remedies available to the FDIC for breach of this warranty shall include repair or replacement of any product or service whose non-compliance is discovered and made know to the contractor in writing within one year after acceptance of that product or service.  Nothing in this warranty shall be construed to limit any rights or remedies the FDIC may otherwise have under this contract with respect to defects other than Year 2000 date processing defects.  In the event that another provision in this contract provides a Year 2000 Warranty or Representation, that other provision shall control and this warranty shall be of no force or effect.

## ARTICLE VIII.  PRICE WARRANTY

8.1    Contractor Warranty.  Contractor warrants that, at the time of award of this Contract, the prices and hourly rates charged do not exceed those currently charged by Contractor to any other public customer purchasing the same or similar goods or services in like or smaller quantities under similar conditions.

Version 2.0
November, 1996

10

# STATEMENT OF WORK
# FOR
# FDIC SECURITY SERVICES
# UNDER CONTRACT NO. 99-00086-C-J3

**1.0    SCOPE.**

Contractor shall provide security services for all Federal Deposit Insurance Corporation ("FDIC") owned and leased property in the District of Columbia and Northern Virginia. Contractor shall also provide clerical personnel to support the day-to-day operation of FDIC's parking programs. Contractor shall furnish management, supervision, manpower, equipment, and supplies necessary to provide the services stated herein.

**2.0    BACKGROUND / OBJECTIVES / FDIC DESIGNATED PERSONNEL.**

**2.1    Security Services Section Responsibilities.**

The FDIC's Corporate Services Branch, Security Services Section is responsible for providing security services for the protection of FDIC personnel, property, and facilities. This office is also responsible for providing transportation services and parking administration.

**2.2    Contract Objectives.**

There are essentially three objectives of this Contract. The primary objective is to protect FDIC employees, FDIC property, and the general public while in FDIC buildings or on FDIC grounds. The close proximity of FDIC owned and leased property in Washington, D.C. to the White House and other key Federal buildings mandates the second objective, which is to prevent infiltration of any FDIC property for subversive purposes. The third objective is to provide efficient parking program customer service and a well balanced parking program which employs fair standards for all participating employees. Contractor shall meet these objectives by (1) providing a thoroughly trained, fully qualified and properly certified protective guard force and competent clerical personnel to support the FDIC's parking program, (2) satisfying all Contract requirements, and (3) strictly adhering to FDIC regulations, policies and procedures. Because Contractor's protective guard force will be highly visible and reflect the Corporation's image, Contractor's employees (hereinafter referred to as "Contractor Personnel") shall demonstrate a maximum degree of professionalism in appearance and operation.

**2.3    FDIC Oversight Manager and Technical Monitors.**

The FDIC will designate an Oversight Manager ("OM") who will have overall responsibility for overseeing the technical aspects of this Contract. The FDIC will also designate two Technical Monitors who will assist the OM, as necessary, with respect to this Contract. One Technical Monitor will assist the OM on all security matters ("Security TM"), and one will assist the OM on all parking program matters ("Parking TM"). These designated FDIC individuals are identified below:

| | |
|---|---|
| FDIC Oversight Manager: | Janet Sillaway – Tel: 202/898-3611 |
| FDIC Security Technical Monitor: | Linda J. Phillips – Tel: 202/898-3610 |
| FDIC Parking Technical Monitor: | Dwight Wilson – Tel: 202/942-3279 |

### 5.7.5   Guard Manual / Post Information & Materials.

The OM or Security TM will prepare, provide and update the following information: Guard Manual, Post Orders, VIP photos, Bar notices, employee directories, emergency procedures, Emergency Notification List, and other materials as necessary.  Post Orders will provide details, procedures, and instructions for the proper performance of assigned duties.  The OM will maintain originals and provide copies of these materials to Contractor.  Contractor shall ensure compliance with, and implementation of, all orders and shall distribute changes, revisions, and updates to each Post.  Contractor shall also ensure that the materials are kept current.  If Contractor determines a change is needed, Contractor shall note the change and submit the request to the OM for inclusion in an updated version.  Contractor shall not accept changes, deletions or additions to Post Orders from anyone other than the OM or Security TM.

## 6.0   STANDARDS OF CONDUCT.

Contractor shall provide a Code of Conduct that its employees shall abide by under this Contract.  The Code of Conduct shall direct Contractor Personnel to adhere to principles which reflect credit upon himself, his employer and the FDIC, to maintain satisfactory standards of competence, appearance, and integrity.   The Code of Conduct shall be prominently displayed in the F1C-3A and Virginia Square Guard Offices.  Any sub-standard behavior by Contractor Personnel shall require Contractor to take whatever disciplinary action is necessary.

### 6.1   Encroachment.

Contractor Personnel shall not disturb contents in FDIC offices, on employee desks, in open or closed desk drawers and cabinets, nor use the FDIC telephones or other electronic communications equipment for purposes other than those authorized by the FDIC.

### 6.2   Personal Appearance.

Contractor Personnel shall practice proper personal hygiene and shall be neat and clean at all times.  Contractor Personnel (except the Secretary and General Clerks) shall comply with the following personal appearance guidelines:

- Fingernails shall be clean and nail polish (if worn) shall be clear;
- Hair shall be clean and neat; Hair ornaments (e.g., flowers, combs) may not be worn;
- Mustaches and sideburns shall be neatly trimmed;
- Makeup worn by female Security Officers shall be subdued and natural looking; and
- Jewelry shall not be worn except rings may be worn on the third finger of either hand.

## 6.3    Proper Dress.

The Secretary and General Clerks shall wear proper business attire.  All other Contractor Personnel shall wear uniforms.  Contractor Personnel shall keep uniforms, insignia, accessories, and equipment clean and in good repair at all times.  Uniforms shall be maintained and worn as follows:

- **Hats** shall be worn squarely on the head, with the sweatband snugly against the forehead, except when in a motor vehicle or when stationed at an indoor Post;

- **Long-sleeved shirts** may be worn as under or outer garments.  Long-sleeved shirts shall be worn October 1st – April 30th;

- **Short-sleeved shirts** may be worn as outer garments.  When the shirt is used as an outer garment, suspenders and folded sleeves are not permitted.  Short-sleeved shirts shall be worn May 1st – September 30th;

- **Trousers** shall fit properly and not be cuffed and hems shall touch the shoe top;

- **Overcoats or windbreakers** shall be issued to officers assigned to outside duties in cold weather;

- **Black socks** shall be worn and shall be long enough so that skin does not show below trousers when sitting.  White socks may be worn only if required; and

- **Footwear** shall be shined and in good condition. Shoes shall be black, low quarter or high topped, lace type with police or plain toe and standard heel.

## 6.4    Grounds for Being Removed From Duty.

The OM may request Contractor to remove Contractor Personnel from duty for any of the following types of misconduct or delinquency.  In the event such request is made, Contractor shall promptly comply with the OM's request, revoke all identification credentials as necessary and properly complete all required dispositions.

### 6.4.1    Neglect of Duty.

Sleeping, smoking, eating, reading unauthorized material, drinking, loitering, unreasonable delay, failure to carry out assigned tasks, conducting personal affairs, appearing inattentive to duties, refusing to render assistance, or leaving a Post unattended while on duty or being uncooperative in upholding the integrity of the FDIC security program.

### 6.4.2    Disorderly Conduct.

Use of abusive or offensive language, quarrelling, intimidation by words or actions, fighting or participation in disruptive activities that interfere with normal and efficient operations.

### 6.4.3    Criminal Acts.

Theft, vandalism, immoral conduct, and involvement in any criminal activity.

**6.4.12  Falsification of Information.**

Falsification of information entered on suitability, background, or employment forms.

**6.4.13  Concealment of Information.**

Unlawful concealment of information by willful omission and/or removal or destruction of any official document or record of material fact.

**6.4.14  Conviction.**

Conviction of a felony, crime of violence or serious misdemeanor (a felony is any crime punishable by imprisonment for more than one year, a misdemeanor is a crime punishable by imprisonment for one year or less).

**6.4.15  Arrests.**

Possession of an arrest record for continuing offenses.

**7.0  JURISDICTION AND POLICE AUTHORITY.**

**7.1  Jurisdiction.**

Contractor's authority shall be limited to space under the charge and control of the FDIC and shall not be extended into any other area for any reason. Contractor shall be responsible for upholding law and order in FDIC owned and leased buildings and on FDIC grounds, to include courtyards and sidewalks.

**7.2  Authority.**

Contractor shall provide Contractor Personnel (except the Secretary and General Clerks) with police authority sufficient in scope to detain individuals for any violation of law occurring at locations specified in this Contract.

**7.3  Bonds.**

Contractor shall be responsible for bonds, fees, and costs related to the appointment of Guard II employees as Special Police Officers ("SPO's"), or other official designations and/or authorizations required for arming its Contractor Personnel hired under this Contract.

**7.4  Liability.**

Contractor shall assume full liability for any act of its Contractor Personnel when exercising their police authority or other obligations under this Contract.

16

**9.5    Project Manager's Vehicle.**

Contractor shall provide a suitable late model automobile, truck, or other similar vehicle, which is in keeping with the high visibility of the Project Manager's position. The vehicle shall be capable, at a minimum, of carrying six (6) passengers, have a suitable radio or mobile phone, and be properly equipped for inclement weather to ensure the Project Manager has the capability to perform as directed by this SOW. The Project Manager shall make trips between Posts in Washington, D.C. and Virginia Square in the normal course of duty.

**9.6    Weapons.**

Contractor shall supply .38 caliber, police service-type revolvers, .38 caliber ammunition, holsters and belts. Contractor shall store these weapons at FDIC. Six (6) rounds shall be issued with each weapon. Ammunition shall be standard, police service-type cartridges containing a light powder load and a non-expanding, 158 grain, soft-nosed bullet. The Project Manager, Supervisors and Commanders shall be armed at all times. A few of the Posts require Security Officers to be armed. Security Officers working on unarmed Posts may be directed to bear arms at any time by the OM, Security TM or the Assistant Director of the Security Services Section (FDIC Security office). Contractor shall ensure optimum operation of weapons. No backup weapon or other firearms shall be issued or worn.

**10.0    PERSONNEL QUALIFICATION REQUIREMENTS.**

**10.1    Suitability Requirements.**

All Contractor Personnel shall be subject to a suitability check performed by Contractor. Documentation shall be filed and maintained in the F1C-3A Guard Office. *Final results of the suitability checks shall be furnished to the OM in writing prior to the Contractor Personnel entering on duty.*

The suitability check shall consist of:

- Personal background investigation;
- Arrest/Police record checks (DC, VA & MD and any other state of former residence) for the previous five years;
- Verifications of names (e.g., AKA, FKA, Married, Maiden, Foreign);
- Present and former addresses for the previous five Years;
- Education;
- Employment history for the previous five years;
- A minimum of two written personal references;
- Fingerprint classification; and
- Any other information related to the preceding areas

## 12.0    CERTICIFICATION THAT CONTRACTOR PERSONNEL POSSESS MINIMUM QALIFICATION REQUIREMENTS.

### 12.1    Certification.

Contractor shall certify in writing, *for each person* hired under this Contract, that the individual meets *ALL* of the suitability, personnel, and training qualification requirements specified in this SOW *(If Contractor provides one certification, Contractor shall reference each Security Officer's name)*. This certification applies to any individual working on this Contract, including individuals who were employed by previous FDIC contractors and subsequently hired to work for Contractor under this Contract. *The certification shall be provided to the OM prior to any new Contractor Personnel entering on duty under this Contract.* The certifications shall be filed in the F1C-3A Guard Office.

### 12.2    Waiver.

In unusual circumstances, Contractor may request the OM to provide a temporary waiver or special exemption for an employee who has not met all of the minimum personnel and training qualification requirements. Contractor's request must be submitted to the OM and approved prior to the Contractor Personnel entering on duty. The OM will return his/her approval/disapproval, in writing. If the request for a waiver is for training, Contractor shall include the following information in its request:

- Name of the Contractor Personnel for which the waiver is being requested (also include labor category);
- Specify the portion of the training Contractor is requesting be waived;
- A thorough justification;
- Evidence that prior training is equal to, or exceeds the requirements as set forth in this SOW;
- Documentation which attests to completion of training within 18 months prior to the date of employment under this Contract; and
- Assurance that the individual has successfully completed all other required training.

Contractor shall file and maintain waiver documentation in the F1C-3A Guard Office.

## 13.0    QUALITY CONTROL PROGRAM.

### 13.1    Implementation of Quality Control Program.

Contractor shall implement a Quality Control Program to ensure contract requirements are performed as specified in this SOW. Contractor shall designate a Quality Control Monitor to oversee the QC Program. Contractor shall notify the OM in advance of any change in Quality Control Monitor appointments. Under no circumstances shall individuals appointed as the Quality Control Monitor serve as Project Manager, Supervisor, Shift Commander, SOC Supervisor or Security Officer under this Contract.

**Modification No. 2**
**To Contract No. 99-00086-C-J3**
**Page 2 of 4**

Contract No. 99-00086-C-J3 is modified as follows:

## *Changes to the Contract:*

1.  Article 3.1 (*"Key Personnel"*) is modified to change the names of the Key Personnel, as
    follows:

    *Delete:*

    | <u>Name</u> | <u>Title</u> | <u>Effective Date</u> |
    | --- | --- | --- |
    | J. Stephen Johnson | Project Manager | May 17, 1999 |

    *Replace with:*

    | <u>Name</u> | <u>Title</u> | <u>Effective Date</u> |
    | --- | --- | --- |
    | Douglas Fahey | Project Manager | June 1, 1999 |

## *Changes to the Statement of Work:*

2.  The FDIC is modifying the Statement of Work to re-incorporate the requirement for
    completing GSA Form 139. FDIC will revert back to relying on both Contractor's
    electronic personnel timekeeping system and the GSA Form 139's to verify Contractor
    Personnel time and attendance for billing purposes. As a result of this change, Sections
    4.4.2, 5.1, 5.5.1, and 9.1 of the Statement of Work are modified as follows:

    A.  Section 4.4.2 (*"Records"*) is modified to add the words, "GSA Form 139".
        Therefore, the last sentence of this Section is deleted in its entirety and replaced
        with the following:

        "Records shall include but not be limited to: Incident Reports, Operations Logs,
        Patrol Officer Reports, TAS Reports, Weapons Inventory and Maintenance
        Forms, FDIC Equipment Inventory, GSA Form 1051, Visitor Logs, GSA Form 139
        and Contractor Personnel data."

Federal Deposit Insurance Corporation
**Division of Administration, Acquisition and Corporate Services Branch**
1700 Pennsylvania Avenue, NW, Room 4104
Washington, DC 20006
## MODIFICATION OF CONTRACT

| | |
|---|---|
| 1.  Modification Number:<br><br>        5 | 2.  Effective Date:<br>        **See Description of Modification** |
| Vendor's Name and Address:<br><br>Securiguard, Inc.<br>Attn:  Fred Williamson<br>6858 Old Dominion Drive, Suite 307<br>McLean, Virginia  22101 | Modification of Contract/Order Number:<br><br>**Contract No. 99-00086-C-J3**<br>**("FDIC Security Services")**<br><br>Dated:     **April 25, 1999** |

This Modification is Issued Pursuant To:

☐   Authority of the FDIC Contracting Officer.        ☑  Mutual Agreement of the Parties Hereto.

Description of Modification
The purpose of this Modification is to:

1. Increase the security related labor category hourly rates by $0.03 to provide an equitable adjustment to cover Contractor's additional expenses related to the new training requirements for Special Police Officers;
2. Make changes to the hours required under Post #2, #11, #21, #24 and add Post #40;
3. Change the name of the labor category entitled "Security Operations Center Supervisor" to "Security Operations Center Technician" and add a labor category entitled, "Security Operations Center Officer".
4. Add a new Investigator position to the Contract;
5. Increase the compensation ceiling amount for the Initial Period of Performance; and
6. Revise the Contract to allow for reimbursement of travel expenses incurred by the Investigator.

As a result, Contract No. 99-00086-C-J3 is modified as stated on the following pages.

☐  Contractor is not required to sign this document        ☑ Contractor is required to sign this document
and return 2 copies to issuing office.

| 3. Contractor:  Securiguard, Inc.<br><br>By: _Patricia Del Maryil_<br>Name and Title (type or print):<br><br>PATRICIA DEL. MARYIL, CEO<br>5.Date Signed: __4/5/00__ | 4.  Federal Deposit Insurance Corporation:<br><br>By: _Carolyn Follin_<br>Name of Contracting Officer:<br><br>Carolyn Follin<br><br>6. Date Signed: __4-20-2000__ |

**Modification No. 5**
**To Contract No. 99-00086-C-J3**
**Page 3 of 4**

C.  Effective March 1, 2000, the FDIC hereby adds a new Investigator position to the Contract. As a result, the Statement of Work is modified to include the following language as Section 10.3.9:

"**Qualifications**. The Investigator shall have completed an accredited law enforcement academy and possess a minimum of 3 years investigative experience. The Investigator shall have a private investigator (PI) license for Washington, DC and Virginia unless otherwise waived by the FDIC Oversight Manager.

"**Duties**. The Investigator's duties shall include, but not be limited to the following:

- Conduct long-term, short-term, and odd hour investigations;
- Conduct interviews;
- Develop and follow leads;
- Take statements;
- Gather information and facts;
- Research records;
- Analyze and evaluate information;
- Prepare narrative reports;
- Prepare statistical reports;
- Institute and maintain databases;
- Coordinate FDIC's security awareness day;
- Develop FDIC's security awareness program;
- Evaluate crime prevention programs;
- Develop and recommend changes to current FDIC programs; and
- Travel to FDIC field offices for investigative or information purposes, as requested by the FDIC Oversight Manager.

This is a plain clothes, unarmed position. The Investigator shall carry a cell phone. The Investigator shall work 8 hours per day, 5 days per week, excluding holidays.

D.  Section 3.1 of the Contract ("Key Personnel") is modified to change the names of the Key Personnel as follows:

Delete:

| "Name | Title | Effective Date |
|-------|-------|----------------|
| Douglas Fahey | Project Manager | June 1, 1999 |
| Archie Moses | Site Supervisor (Washington, DC location) | April 25, 1999 |
| Ernest Brooks | Site Supervisor (Arlington, VA location) | May 17, 1999 |
| Patrick Devine | Security Operations Center Supervisor | May 17, 1999" |

And replace with:

| "Name | Title | Effective Date |
|-------|-------|----------------|
| Charles Boring | Project Manager | October 6, 1999 |
| Joseph Ortman | Site Supervisor (Washington, DC location) | December 1, 1999 |
| Archie Moses | Site Supervisor (Arlington, VA location) | December 1, 1999 |
| Douglas Fahey | Investigator | March 1, 2000" |

Modification No. 16
To Contract No. 99-00086-C-J3
Page 2 of 2

Contract No. 99-00086-C-J3 is modified as follows:

## *Changes to the Contract*.

1.     Pursuant to Section 2.2 (*"Option Period"*), Option Period 2 is exercised.  As a result, the Period of Performance, as specified in Section 2.1 ("Initial Period of Performance"), is extended from April 24, 2002, to April 24, 2003.

2.     Section 3.1 of the Contract  (*"Key Personnel"*) is modified to include the Emergency Preparedness Officer position to the list of Key Personnel (this labor category was added to the Contract under Modification No. 14).  The following revised list of Key Personnel is hereby incorporated into the Contract:

| *"Name | Title | Effective Date |
|--------|-------|----------------|
| Charles Boring | Project Manager | October 6, 1999 |
| Joseph Ortman | Site Supervisor (Washington, DC location) | December 1, 1999 |
| Archie Moses | Site Supervisor (Arlington, VA location) | December 1, 1999 |
| Douglas Fahey | Investigator | March 1, 2000 |
| Shayne Sullivan | Emergency Preparedness Officer | December 17, 2001" |

3.     The compensation-ceiling amount for Option Period 2 (4/25/02 - 4/24/03), as stated in Section 4.1.1 of the Contract (*"Compensation Ceiling"*) at the time of award, is increased by **$1,481,187**, from **$3,651,477** to **$5,132,664**.   The FDIC will adjust the compensation-ceiling amount for Option Period 3 when, and if, exercised.  The hourly rates for Option Period 2 are set forth in the revised Pricing Schedule that was incorporated into the Contract under Modification No. 15.

## *Changes to Security Posts:*

1.     Effective March 15, 2002, Post #7 hours are changed from 0900-1700 TO 0800-1600.

2.     Effective approximately October 2001, Post #12 hours are changed from 0730-1530 TO 0800-1600.

Except as provided herein, all other terms and conditions of the Contract remain unchanged an in full force and effect.

*Attachment:  1 - Revised Exhibit I to SOW (Property Descriptions and Post Assignments)*

### *** END OF MODIFICATION NO. 16 ***

# FDIC SECURITY SERVICES CONTRACT

## CONTRACT NUMBER 03-00303-C-CF

Contract executed on **May 17th**, 2004 (Execution Date) and effective as of ~~May 17~~, 2004 (Effective Date) between the FEDERAL DEPOSIT INSURANCE CORPORATION, acting in its corporate capacity (FDIC), and USEC Service Corporation, a corporation organized and existing under the laws of Virginia with its principal place of business at 7531 Leesburg Pike, Falls Church, Virginia 22043 (Contractor).

## WITNESSETH:

The FDIC, in its corporate capacity, desires to retain Contractor, and Contractor desires to perform the services described in this contract ("Contract"), upon the terms and conditions set forth below.

Now, therefore, in consideration of the mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the FDIC and Contractor agree as follows:

## ARTICLE I.  APPOINTMENT AND DUTIES OF CONTRACTOR

### 1.1    Independent Contractor

The FDIC hereby retains Contractor as an independent contractor for the sole purpose of performing the services described in this Contract. If this contract permits subcontracting, the use of the term "Contractor" herein shall refer to both the Contractor and any and all Subcontractors at all levels. Contractor must ensure that any and all Subcontractors adhere to all of the terms and conditions that have flow-down requirements.

### 1.2    Duties

Contractor hereby agrees to perform such services (the Services) on the terms and conditions set forth below and in the following documents, which are incorporated by reference:

- **Statement of Work**, Attachment 1 to this Contract.
- **Contractor's Proposal or Amended Proposal, if any**, Attachment 2 to this Contract.
- **FDIC General Provisions**, Attachment 3 to this Contract.
- **U.S. Department of Labor Wage Determination**, Attachment 4 to this Contract.
- **FDIC Contractor Travel Reimbursement Guidelines, Attachment**, Attachment 5 to this Contract.

Contractor is required to notify the FDIC Contracting Officer and Oversight Manager in writing of any change in Contractor's physical location for the Place of Performance of this Contract. This must include without limitation any facilities relocation and/or re-construction activity or any other planned event that may impact the continued operation of contractor-operated network equipment located on the contractor's premises. The notification must be made at least thirty days in advance of the planned change or start date for any such activity to allow the FDIC time to take appropriate action.

Contractor must ensure that all connections and access to the FDIC network and systems are removed and no longer active using appropriate security procedures at the time of expiration or termination of this Contract, whether contractor or subcontractor employees are working on-site or off-site, and notice must be provided to the Oversight Manager upon completion of these requirements. Contractor must also undergo the FDIC pre-exit clearance procedures at the time of separation.

### 1.3    Standard of Performance

Contractor must at all times act in good faith and in the best interests of the FDIC, use its best efforts and exercise all due care and sound business judgment in performing its duties under this Contract. Contractor must at all times comply with FDIC policies, procedures and directives, which are incorporated by reference and made part of this Contract.

### 1.4    Calendar Days

Unless specifically provided otherwise in this Contract, the term "days" used anywhere in this Contract means calendar days.

### 1.5    Monthly Report

If subcontracting or joint venturing is approved, Contractor must submit to the Contracting Officer a Subcontractor or Joint Venture Activity Report, on a monthly basis, addressing for each subcontractor, Joint Venture and/or Teaming Arrangement Participant(s), the following:

a.    Name, address, tax identification number and type of business concern [Minority Women Owned Business, Small Disadvantaged Business and applicable Standard Industrial Classification (SIC) Code and corresponding geographic location if applicable] for each subcontractor or Joint Venture participant.

b.    Period covered by Report.

c.    Description of work performed by subcontractor or Joint Venture participants during the report period.

d.    Percentage of services planned and actually provided by subcontractor or Joint Venture Participant during the report period and cumulative to date by SIC code if applicable.

e.    Total compensation paid to subcontractor or Joint Venture participants during the report period and cumulative to date.

2

f.    Percentage completion toward Subcontracting Plan goals and/or Joint Venture commitments.

## ARTICLE II.  PERIOD OF PERFORMANCE

*Douglas*
*Fahey paird*
*under Securyend*
*duy performme*

### 2.1    Initial Period of Performance

This Contract has a two (2) year period of performance starting on the May 17, 2004 and expiring on May 31, 2006 (the "Period of Performance"), subject to exercise of an option, if applicable, or to earlier termination under the General Provisions of this Contract.

### 2.2    Option Period

This Contract may be extended, at the discretion of the FDIC, for three (3) one-year period(s) each an "Option Period". Except where specifically indicated otherwise, "Period of Performance" as used hereafter in this Contract refers both to the initial Period of Performance and to any Option Period which may be exercised.

### 2.3    Notice of Exercise of Option

If the FDIC desires to exercise the option to extend the Period of Performance, the FDIC must notify Contractor, in writing, of its intent not less than sixty (60) days before the expiration of the initial Period of Performance.

## ARTICLE III.  SECURITY AND CONFIDENTIALITY REQUIREMENTS

### 3.1    Background Investigations

3.1.1    Background investigations will be conducted for all contractor and subcontractor personnel. The extent of the investigations will be in direct relation to the risk level assigned to the contract or to the individual job classifications, which can be found in Section 3.2 of this contract.

3.1.2    Each contractor and subcontractor employee working on the contract must complete an electronic fingerprint application and credit report authorization. No employee will be permitted to begin work (including access to FDIC facilities, network, and systems) until a favorable fingerprint records check and credit report has been received by the FDIC, unless a waiver has been obtained.

3.1.3    Within 5 days after the effective date hereof, the contractor must provide the Contracting Officer with a list of all contractor and subcontractor personnel working on the contract. This list must include the employee's name, current home address, and assigned risk level. The contractor must identify each

3

employee who has a previous current or otherwise valid background investigation, and such background investigations must be furnished to FDIC with the list of personnel.

For those employees of the contractor or subcontractor who do not have a valid and current background investigation, a background investigation will be conducted for them. In that event, the requirements relating to background investigations contained herein will control.

NOTE: A valid background investigation is one that meets the minimum investigation for the risk level established for the contract or contract job category, and that has been conducted within 5 years of the date of contract award.

3.1.4    An adverse finding during the background investigation or fingerprinting review (e.g., felony conviction), or a completed background investigation or fingerprint check that indicates that the employee cannot meet the designated security requirements, may prohibit a contractor or subcontractor employee from working on the contract. That employee may be removed at the discretion of the Contracting Officer and replaced with an employee acceptable to FDIC by the Contractor at no additional expense to FDIC and without relief in all contractual performance and delivery requirements.

3.1.5    All contractor and subcontractor employees regularly working on-site at an FDIC facility will be issued a yellow identification/access control badge. Such employees will not be granted on-site access until FDIC receives a favorable fingerprint criminal records check from the FBI. The badges will be issued for a six-month period and must be renewed after each six-month period.

3.1.6    Contractor must notify the Contracting Officer of any new contractor or subcontractor personnel assigned to the contract or any change in assignment of current personnel. FDIC will perform the appropriate background investigations and fingerprint check for any such personnel. Access to FDIC facilities, network, and systems will be as set forth in this section 3.1.

3.2    Risk Level Designation
The following risk level has been assigned to this contract: **high.** The post-award background investigations and fingerprinting required for all contractor employees (and subcontractor employees, if applicable) will be for this risk level.

The post-award background investigations and fingerprinting required for all contractor employees (and subcontractor employees, if applicable) will be for these risk levels.

4

### 3.3    Confidentiality of Information, Data, and Systems

Contractor must ensure the confidentiality of all information, data, and systems provided by FDIC or used or obtained by Contractor personnel under this contract and prevent its inappropriate or unauthorized use or disclosure. Contractor and all employees working on an FDIC contract must sign the Contractor Confidentiality Agreement (attached) no later than five (5) business days after starting performance and prior to receiving such information, or when receiving their badges, and return the signed Agreements to the Contracting Officer. This includes Contractor personnel who are required to work on-site at an FDIC facility or have access to FDIC sensitive information or data, systems or network. Failure to provide the signed Agreements may result in the removal of the employee from performing under the contract.

### 3.4    Security Requirements for Information Technology.

The Contractor is responsible for Information Technology (IT) security for all personnel with access to the FDIC network, systems connected to the FDIC network or those systems developed and/or operated by the Contractor for FDIC. This clause is applicable to all or any part of the contract that includes information technology resources or services in which the Contractor may have physical or electronic access to FDIC's information contained in its systems. This includes but is not limited to information technology, hardware, software, and the management, operation, maintenance, programming, and system administration of computer systems, networks, and telecommunications systems. Examples of tasks that require security provisions include but are not limited to acquisition, transmission or analysis of data owned by FDIC or access to FDIC networks or computers at a level beyond that granted the general public, e.g., bypassing the FDIC firewall.

Contractor, its subcontractors, and the employees of each must sign a confidentiality agreement at any time prior to or during the performance of this contract at the direction and discretion of the Contracting Officer.

### 3.5    IT Security Plan

The Contractor must provide as a deliverable, implement, and maintain an IT Security Plan ("Plan") for the duration of this contract. This Plan must describe the processes, procedures and training of personnel that will be followed to ensure appropriate security of IT resources that are developed, processed, or used under this contract. The Plan must describe those parts of the contract to which this clause applies. It must address the security measures and program safeguards that will be provided by the Contractor. These measures and safeguards must ensure that all information systems, data, and resources acquired and utilized in the performance of this contract by the Contractor personnel:

a.  Are protected from unauthorized access, alternation, disclosure, or misuse of processed, stored, or transmitted information;
b.  Can maintain the continuity of IT support for the FDIC and its programs and operations;

5

Procurements/Third Party Products, which can be found on FDIC's website at
www.fdic.gov.

### 3.8.2   Cost of Information Security

For all contracts valued at $3 million or more, the Contractor must identify on its
invoices as a separate line item any direct cost to the contractor for information
security as a specific element of the cost of providing information services.

### 3.9   FDIC Access

The Contractor must afford FDIC, including the Office of Inspector General, access to the
Contractor's and all subcontractors' facilities, installations, operations, documentation,
databases, and personnel used in performance of the contract.  Access must be provided to the
extent required to carry out a program of IT inspection, investigation and audit to safeguard
against threats and hazards to the integrity, availability and confidentiality of FDIC data, systems,
software and hardware or to the function of computer systems operated on behalf of FDIC or the
network accessed by the Contractor personnel and to preserve evidence of computer crime or
misuse.

### 3.10   Subcontractor Requirements

Contractor must incorporate this Article in all subcontracts that meet the conditions or
requirements stated in this Article.

## ARTICLE IV.  PERSONNEL AND SUBCONTRACTING

### 4.1   Key Personnel

The following key personnel are essential to the proper performance of Contractor's duties
under this Contract ("Key Personnel") and will perform the roles specified below:

| Name | Title |
|------|-------|
| Christopher Taylor | Project Manager |
| Joseph Ortman | Site Supervisor – DC |
| Milton Darrell | Site Supervisor – Virginia Square |
| Avis Williams | Clerk IV |
| Darlene McClearn | Secretary |
| Chinweoke Ibeakuzie | Badging Technician |
| Douglas Fahey | Investigator |
| Bernard Holt | Emergency Preparedness Officer |

*[handwritten note in left margin: Fahey paid by ... USSC]*

Contractor's Proposal, or Amended Proposal, if any, identified the above individuals as Key
Personnel and certified their availability to perform the duties specified.  Contractor agrees to make
the Key Personnel available as required for performance of the duties under this Contract as long as
such persons are employed by Contractor or its related entities.  Prior to diverting or reassigning any

8

part of the work or requirements of this Contract do not come within the definition of Contractor Personnel and are either subcontractors or employees of subcontractors.

### 4.5.1 Authorization; Selection of Subcontractors.

(a)    Contractor will not engage subcontractors to perform any of its responsibilities under this Contract without the prior written approval of the FDIC. This prohibition does not apply to contracts or orders for purchase of equipment, materials or supplies to be used in the performance of this Contract. If Contractor's Proposal leading to this Contract requests approval for the use of named or designated subcontractor(s), and if the FDIC has accepted that Proposal, the subcontractor(s) will be deemed approved and further approval will not be needed.

(b)    Consent by the FDIC to any proposed subcontractor will not: (1) constitute a determination of the acceptability of any subcontract terms or conditions; or (2) constitute a determination of the acceptability of any amount paid under any subcontract; or (3) relieve Contractor of any of its responsibilities under the Contract. Contractor will award subcontracts only to third parties that have filed FDIC Certifications with Contractor.

(c)    The following subcontractors are approved for performance under this Contract:

### Securiguard, Inc. (42.2%) MWOB

(d)    Contractor must notify the FDIC of any changes in subcontracting arrangements. If the subcontractor is a Small Disadvantaged Business (SDB), any changes must result in the same or greater SDB participation.

### 4.5.2 Contracts with Subcontractors

Contractor will not be reimbursed for subcontracting costs except as specifically provided for in this Contract. Contractor must assure that all contracts it enters into with subcontractors will be consistent with the terms of this Contract, including, but not limited to, certifications, termination, stop work, confidential information and insurance.

### 4.6    Use of Premises by Contractor Personnel

Contractor must comply with the regulations of the FDIC governing access to facilities and operations while on FDIC premises. Contractor must perform its contract activities in such a manner as to not interrupt or interfere with the conduct of FDIC business. All persons employed under the Contract must observe the regulations in effect while on FDIC premises.

### 4.7    Subcontracting Plan Compliance.

In contracts where subcontracting is permissible and in accordance with the Contractor's proposal as incorporated within the terms and conditions of the Contract, the Subcontracting Plan is considered a material part of the Contract. The Contractor's failure to comply with and make

10

EFT information must be entered and continuously updated at the Central Contractor Registration (CCR) website www.ccr.gov to ensure payments are made to the proper location. It is solely the responsibility of the contractor to maintain accurate EFT information in CCR. For further information, please refer to paragraph 8 of the FDIC General Provisions.

## ARTICLE VI.  INSPECTION AND ACCEPTANCE

6.1    Inspection and Acceptance of Work Product
In accordance with the General Provision of this Contract, "Inspection of Goods or Services," the FDIC will have 15 business days from the date of Contractor's delivery of Work Product to determine if such Work Product is in compliance with the requirements of the Contract. Inspection by the FDIC will be conducted by the FDIC Oversight Manager.

6.2    Risk of Loss or Damage
Contractor retains title to all materials and equipment until receipt of the FDIC's written acceptance and payment after final inspection of the finished installation.  Title may transfer at an earlier date but only upon written notice to Contractor by the Contracting Officer.  Risks of loss or damage by fire or other causes to material or property ordered by Contractor are the sole responsibility of Contractor until acceptance by the FDIC.  Contractor will be liable to the FDIC for any and all damage to FDIC-owned and FDIC-leased property as a result of this work.

## ARTICLE VII.  RIGHTS IN SOFTWARE AND SYSTEMS

7.1    Proprietary Interest and License in Software and Systems
The FDIC and Contractor agree that the FDIC has the exclusive and absolute right, title and interest in and to all systems and software owned by the FDIC, or otherwise obtained or developed for the FDIC at its expense, and furnished to Contractor for use in the performance of Contractor's Services under this Contract.

## ARTICLE VIII.  REPRESENTATIONS

8.1    Representations of Contractor
Contractor represents as follows:

8.1.1 The execution, delivery and performance of this Contract have been duly authorized by all necessary corporate action of Contractor.

8.1.2 Contractor currently possesses all necessary licenses, permits and approvals required to execute, deliver and perform its duties under this Contract and is qualified to do business in all jurisdictions where such qualification is required for Contractor's performance of its duties under this Contract.

14

8.1.3 At the time of execution of this Contract, there has been no change in any of the Certifications Contractor submitted to the FDIC with its proposal. Contractor agrees to notify the Contracting Officer immediately, in writing, of any change to Contractor's Certifications.

## ARTICLE IX.  PRICE WARRANTY

### 9.1     Contractor Warranty

Contractor warrants that, at the time of award of this Contract, the prices and hourly rates charged do not exceed those currently charged by Contractor to any other customer, public or private, purchasing the same or similar goods or services in like or smaller quantities under similar conditions.

## ARTICLE X.  INSURANCE COVERAGE

### 10.1    Liability Insurance

Contractor, before commencing work or permitting any subcontractor to commence work, must procure and maintain, at Contractor's own expense, the following insurance or, should such insurance be cancelled, the FDIC shall have the right to procure such insurance, and the cost thereof will be deducted from monies then due or which thereafter become due to Contractor. Contractor may carry any additional insurance as it may deem necessary. Contractor will not be deemed to be relieved of any responsibility by the fact that Contractor carries insurance. The FDIC requires any contractor of the FDIC performing work on FDIC premises to carry and maintain, at no expense to the FDIC:

A.    Worker's Compensation and Employer's Liability Insurance in accordance with the applicable laws of the state in which the work is to be performed or of the state in which Contractor is obligated to pay compensation to employees engaged in the performance of the work.  The policy limit under the Employer's Liability Insurance section shall not be less than One Hundred Thousand Dollars ($100,000) for any one accident; and

B.    Comprehensive Bodily Injury and Property Damage Liability Insurance covering the work, the performance of the work and everything incidental thereto, with Bodily Injury (including death) and Property Damage limits of not less than Five Million Dollars ($5,000,000) per occurrence combined single limit.  This policy must be endorsed to cover:  Contractual liability coverage, completed operations coverage, broad form property damage endorsement and Contractor's protective liability coverage; and

C.    Automobile Public Liability and Property Damage Insurance, including coverage on owned, hired, and non-owned automobiles and other vehicles, if used in connection with the performance of the work, with Bodily Injury and Property Damage limits of not less than One Million Dollars ($1,000,000) per occurrence combined single limit; and

15

Contract
Version 3.5
July 2003

D.    Such other insurance as may be required elsewhere in the Contract documents.

The FDIC must be named as Additional Insured under Contractor's Comprehensive Bodily Injury and Property Damage Liability and Automobile Public Liability and Property Damage Insurance coverage. Contractor's insurance must be primary.

### 10.2    Certificates of Insurance

Contractor must have its insurance carrier or carriers certify to the FDIC that all insurance required is in force, such certificates to stipulate that the insurance will not be cancelled or substantially changed without thirty (30) days prior notice by Certified Mail to the FDIC Contracting Officer.  Contractor must, on request, permit the FDIC to examine original insurance policies.

Contractor must provide the FDIC, no later than ten (10) calendar days after the date of execution of the Contract, evidence of all insurance and bonds specified in this Article X.  Such evidence of insurance may be (1) a binder or (2) a copy of the original policy.  Contractor must also provide, no later than ten (10) calendar days after the date of execution, a Certificate of Insurance which must include the following mailing address and reference the Contract number:

> Federal Deposit Insurance Corporation
> Attention:  Carolyn Follin
> 550 17th Street, NW, Room PA1730-4062
> Washington, DC  20429
> Reference:  Contract No. 03-00303-C-CF

### 10.3    Notice to the FDIC

Contractor must promptly advise the FDIC's authorized representative of all damages to property of the FDIC or of others, or injuries incurred by persons other than employees of Contractor in any manner relating, either directly or indirectly, to the work.

### 10.4    Cost of Insurance

Contractor's expenses in fulfilling the requirements of this Article X will not be reimbursed by the FDIC.

## ARTICLE XI. INDEMNIFICATION

### 11.1    Contractor Indemnification

Contractor agrees to indemnify, hold harmless, and defend the FDIC in all of its capacities, and all of its officers, directors and employees against any and all claims, losses, penalties, fines, forfeitures, amounts paid in settlement, judgments, reasonable attorneys' fees and related litigation

16

costs, fees and expenses which result from any act or omission constituting negligence, willful misconduct or breach of fiduciary duty by any officer, director, agent or employee of Contractor or its subcontractors in connection with Contractor's performance under this Contract.

## ARTICLE XII.  CONFLICT OF INTEREST

### 12.1    Notice to the FDIC

Contractor must notify the FDIC Contracting Officer immediately whenever the work under this Contract conflicts with or appears to conflict with Contractor's obligation to another company or organization.   Contractor must furnish sufficient details to permit evaluation of the situation. Contractor must not proceed with the performance of the work in question until written notification to do so is given by the FDIC Contracting Officer.

17

IN WITNESS WHEREOF, each party has caused this instrument to be signed on its behalf by its duly authorized agent.

CONTRACTOR:  USEC Service Corporation

By: _____

Name:  Andrew D. Marvil

Title:  President

Date:  May 17, 2004


FEDERAL DEPOSIT INSURANCE CORPORATION

By: _____

Name:  E. Rynn Carr-Hawkes

Title:  Contracting Officer

Date:  5/18/04

18

Contract
Version 3.5
July 2003

TAB 3

**AFFIDAVIT**

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**


    **I, James T. Lantelme,** hereby solemnly swear that I am employed in the position of Assistant General Counsel, grade EM, Legal Division, Federal Deposit Insurance Corporation (FDIC), 550 17th Street, NW, Room H-3123, Washington D.C. 20429. My race is Caucasian, my color is white, my gender is male, my date of birth is November 10, 1953, and my religion is Lutheran. I have had prior EEO activities. I have undergone EEO training regarding the preventing, reporting and mitigating of harassment. My first line supervisor is Deputy General Counsel Erica Bovenzi.

    I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint. I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

    I have known Ms. Gibson-Michaels since 1998. Our relationship is purely professional. I am currently Ms. Gibson-Michaels' second line supervisor. I have had some contacts with Ms. Gibson-Michaels since she came to this section in 1998 including during an FDIC reduction-in-force during 2002 and 2003. I am aware that Ms. Gibson-Michaels is an African-American female, skin color black. I was not aware of Ms. Gibson-Michaels' age or religion or of any prior EEO activity by Ms. Gibson-Michaels until I was told about them during the course of this investigation. I learned of the specifics of Ms. Gibson-Michaels' EEO Complaint when I read the Investigator's Letter of Authorization during my interview on September 20, 2004.

        Affiant's Initials _____

Regarding Accepted Issue One, I did initiate an FDIC administrative investigation against Ms. Gibson-Michaels on or about April 14, 2004 for allegedly threatening Student Intern Jenika Johnson. On or about April 14, 2004, Ms. Johnson came to my office visibly upset. Ms. Johnson stated, in substance, that approximately 15 minutes prior, Ms. Gibson-Michaels had threatened Ms. Johnson in connection with an investigation of a theft of her money on FDIC property. Ms. Johnson stated that a few days prior she had reported a theft of money to FDIC Security and that a fellow FDIC Student Intern was a suspect. Ms. Johnson indicated that Ms. Gibson-Michaels talked to her and urged her to drop the charges against the other Student Intern as well as give the other Student Intern money. Ms. Gibson-Michaels had asked Ms. Johnson to do the right thing and indicated to Ms. Johnson that if she did not something bad could happen to Ms. Johnson's child. I asked Ms. Johnson to prepare a write-up of her conversation with Ms. Gibson- Michaels.

*[handwritten margin note: James Lantular inhibited a feeling of "threat"]*

FDIC procedures indicate that when an employee receives a threat the FDIC Management Response Team (MRT) should be contacted. I contacted William Kmetz of FDIC Security and reported my conversation with Ms. Johnson. I did take some notes of my conversation with Ms. Johnson which I believe that I gave to Investigator Douglas Fahey. I am unaware who informed Ms. Gibson-Michaels that she was the subject of an administrative investigation. To the best of my knowledge the resultant investigation was conducted by Investigator Fahey and Mr. Kmetz. I was not involved in the resultant investigation or the investigative decisions made by Investigator Fahey and Ms. Kmetz.

*[handwritten margin note: Mr. Lantular Libel →]*

I was aware that sometime later in April 2004, Investigator Fahey planned to have Ms. Johnson speak to Ms. Gibson-Michaels about the alleged threat. Investigator Fahey

*[handwritten note at bottom: See memo dated 4/26/04 After Reading Affidavit]*

Page 2 of 6                    Affiant's Initials_____ *JL*

had asked Ms. Johnson to conceal an electronic recorder on her person in order to record the conversation between herself and Ms. Gibson-Michaels. The decision to employ a hidden electronic recorder on Ms. Johnson's person was made by either Investigator Fahey or Security Chief Kmetz. I did ask the FDIC Assistant Director for the Labor and Employee Relations Section Randi Mendelsohn about the use of the hidden electronic recorder. I was told that she was aware of and approved the use of the hidden electronic recorder.

After the completion of the investigation, I received a report on Ms. Gibson-Michaels' actions from the MRT. The report indicated that there was no likelihood of physical violence against Ms. Johnson by Ms. Gibson-Michaels. It was nonetheless plain to me that Ms. Gibson-Michaels had interfered with the FDIC theft investigation and had lied about it to the investigators. I proposed that Ms. Gibson-Michaels receive a ten day suspension. Subsequently, the deciding official reduced the ten day suspension to a five day suspension. Ms. Gibson-Michaels has served the five day suspension.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Two, on or about August 12, 2003, I did initiate an administrative investigation against Ms. Gibson-Michaels for allegedly threatening Ms. Terry Hopkins. On or about August 12, 2003, Ms. Hopkins came to my office and

informed me that as an Acting Supervisor she had asked Ms. Gibson-Michaels questions about a leave slip that Ms. Gibson-Michaels had given to Ms. Hopkins. I believe that the initial conversation took place in Ms. Hopkins' office. Ms. Hopkins stated, in substance, that Ms. Gibson-Michaels had objected to Ms. Hopkins' questioning of a signature on the leave slip. Ms. Hopkins felt intimated and left her office. Ms. Hopkins stated that Ms. Gibson-Michaels had followed her down a hall berating Ms. Hopkins. I believe that FDIC Secretary Eyvonne Bryant witnessed Ms. Gibson-Michaels berating Ms. Hopkins.

I contacted the MRT and a subsequent investigation was conducted. The investigation resulted in a conclusion that there was no likelihood of violence. Subsequently, I did orally counsel Ms. Gibson-Michaels about her behavior toward Ms. Hopkins. I do not believe that I made a written comment about my counseling session with Ms. Gibson-Michaels.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Three, Ms. Gibson-Michaels has been treated differently than Mr. Frank Nigro. Mr. Nigro is no longer a FDIC employee. Mr. Nigro retired from FDIC in 2003. I have been told that Mr. Nigro did have an explosive temper. I believe Mr. Nigro received an official admonishment that if he did not retire he would have been subject to severe disciplinary action. I believe that Ms. Gibson-

Affiant's Initials

Michaels had complained to FDIC about Mr. Nigro's behavior. I was Mr. Nigro's fourth level supervisor and did not personally know Mr. Nigro. I believe that Mr. Nigro is a white Caucasian male. I do not know Mr. Nigro's religion. I assume Mr. Nigro's age is over 50 since he was able to retire from the FDIC.

I have no knowledge that Mr. Nigro's race, color, gender, age and religion played any role or influenced in any manner FDIC Officials' decisions and actions about Mr. Nigro's on the job behavior. I have no knowledge of any type of favorable treatment given to Mr. Nigro by FDIC Officials due to Mr. Nigro's race, color, gender, age, and religion.

I am unaware that the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job performance. I believe that Ms. Gibson-Michaels is performing her current duties in a competent manner. I have been asked the question of whether the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job opportunities. I am unaware of any such FDIC job opportunities for Ms. Gibson-Michaels. FDIC has been in the process of becoming smaller and losing positions.

In summary, I have no knowledge of any type of discrimination by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion.

I have nothing further to add to my affidavit.

I have reviewed this statement, which consists of five (5) pages, and hereby solemnly swear that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

Affiant's Initials _____

I declare under the penalty of perjury that the foregoing is true and correct. Executed this

____27th____ day of _September 2004_ (date)

_____
James T. Lantelme


Sworn and Subscribed by _____ Barry Cohen, EEO Contract

Investigator, on_____9/27/04_____ (date).

Affiant's Initials_____

**AFFIDAVIT**

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**


   **I, William A. Kmetz,** hereby solemnly swear that I am employed in the position

of Assistant Director, grade E-1, Security Management Section, Administration Division,

Federal Deposit Insurance Corporation (FDIC), 1776 F Street, NW, Washington D.C.

20429.    My race is Caucasian, my color is white, my gender is male, and my date of

birth is January 4, 1950, my religion is Roman Catholic.    My first line supervisor is Mr.

Michael Rubino, Associate Director, Corporate Services Branch, Administration

Division.    I have had routine FDIC training regarding the preventing, reporting and

mitigating of harassment.

   I have read the Investigator's Letter of Authorization with the Accepted Issues

regarding Ms. Yolanda Gibson-Michaels' EEO Complaint.    I have read and signed the

Notice of Rights of Witnesses in EEO Investigations form.

   I am not sure how long I have known Ms. Gibson-Michaels.    I had seen her once

or twice as a FDIC employee.    Our relationship is purely professional.    I am aware that

Ms. Gibson-Michaels is an African-American female.    I do not know her age or her

religion.    I have never supervised Ms. Gibson-Michaels.    I have no knowledge of any

prior EEO activity by Ms. Gibson-Michaels.    I learned of Ms. Gibson-Michaels's current

EEO Complaint when I was interviewed on September 27, 2004.

   Regarding Accepted One, FDIC has a zero tolerance policy regarding allegations

of work place violence.    I chair the FDIC Management Response Team (MRT).    The

Page 1 of 4                      Affiant's Initials _____

MRT is an informal group of FDIC Officials concerned with the prevention of work place violence at FDIC. On or about April 14, 2004, I believe that I did receive a telephone call from James Lantelme of the FDIC Legal Division informing me as a MRT member and as Assistant Director- FDIC Security that a Ms. Johnson, a Legal Division employee had been allegedly threatened by Ms. Gibson-Michaels. I do not remember the specifics of my telephone call with Mr. Lantelme. After my telephone call with Mr. Lantelme, I contacted Investigator Douglas Fahey and asked him to investigative and make contact with Ms. Johnson. Mr. Fahey was a contract investigator with the Securiguard Corporation. Mr. Fahey was in charge of investigation. Mr. Fahey conducted the interviews in connection with the alleged threat investigation.

Mr. Fahey's investigation was    formalized in the FDIC's Investigations Resources Information Management System (IRIMS). IRIMS is data base that contains investigative and security reports conducted by FDIC Security. I have forwarded Mr. Fahey's IRIMS report of this investigation to the Legal Administration Division

I do remember Mr. Fahey consulting with me about the use of a small electronic tape recorder which was to place in Ms. Johnson's handbag in order to secretly record a conversation between Ms. Johnson and Ms. Gibson-Michaels about the alleged threats that Ms. Gibson-Michaels had made to Ms. Johnson. Mr. Fahey indicated that Ms. Johnson had agreed to the placing of the tape recorder in her handbag in order to record her conversation with Ms. Gibson-Michaels. Mr. Fahey stated that since Ms. Johnson had agreed to the recording of her conversation with Ms. Gibson-Michaels that the recording of the conversation was a normal investigative technique. I advised Mr. Fahey to consult with FDIC Labor Relations and Mr. Lantelme regarding the use of the tape

Affiant's Initials _____

recorder. I understand that this coordination was done, but I do not have any specific details. However, I believe that the participants agreed that since Ms. Johnson had given her permission to record her conversation with Ms. Gibson-Michaels that the use of the hidden recorder was permissible and legal.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

*False*

Regarding Accepted Issue Two, I do not recall the specifics of the 2003 investigation involving an alleged threat made by Ms. Gibson-Michaels to Ms. Terry Hopkins. The investigation was assigned to Investigator Fahey. I believe the investigation was conducted in a routine manner and formalized in the FDIC IRIMS. The report for this investigation has been forwarded to FDIC Administration.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue Two constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

*Lipst, Read Email to Bill knutz 9/12/02*

Regarding Accepted Issue Three, I have no recollection of any events regarding this issue. I do not know Mr. Frank Nigro. I do not recall any conversations or email

Page 3 of 3 init    Affiant's Initials ____

*FDIC Sent to FISP, Senate, FBI*

messages about Mr. Nigro's FDIC job behavior. I have no knowledge of any FDIC favorable treatment of Mr. Nigro based on his Caucasian race, white color, male gender, and such factors as his age and religion.

Mr. Fahey is no longer employed as a contract Investigator by FDIC. He is currently employed by the Federal Bureau of Investigation.

In summary, I have no knowledge of any type of discrimination or reprisal actions by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion. To the best of my knowledge Ms. Gibson-Michaels was treated as any other FDIC employee.

I have nothing further to add to my affidavit.

I have read the foregoing statement consisting of ___4___ pages, each of which I initialed, and it is true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement is made of my free will without any threat, promise of immunity, or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to interested parties.

_____
Signature

Subscribed and sworn before me in _Washington DC_
this ___8th___ day of ___October___, 2004
Investigator _____

Page 4 of X    Affiant's Initials _____

**PRIVACY ACT NOTICE TO INTERVIEW WITNESSES**
**(OTHER THAN COMPLAINANT)**
**FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS**

**GENERAL**

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

**AUTHORITY**

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

**PURPOSES AND USES**

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to **FDIC** activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

**EFFECTS OF NONDISCLOSURE**

Disclosure of the information sought is voluntary; however, failure on the part of **FDIC** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____    _____
Signature of Interviewer    Signature of Witness (person providing statement)

Date: _10-8-04_

Place: _Washington, DC_

**FDIC**

**Federal Deposit Insurance Corporation**

3501 N. Fairfax Drive (Room 801-1231), Arlington, VA 22226-3500                    Office of Diversity and Economic Opportunity

## NOTICE OF RIGHTS OF WITNESSES
## IN
## EEO INVESTIGATIONS

Pursuant to the provisions at 29 C.F.R. §1614.108, federal agencies are required to investigate all aspects of discrimination complaints. The investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, and the treatment of members of the complainant's protected group(s) as compared with the treatment of other employees in the organizational segment in which the complaint arose.

All employees having any knowledge of the matter complained of are required to cooperate with the investigator who is conducting the investigation. The investigator is authorized to administer oaths and require that statements of witnesses be reduced to an affidavit. The witness must swear to or affirm to the truth of the statements before the investigator or a third party, without a pledge of confidentiality. The investigator is also authorized to obtain copies of relevant employment records, policy statements, and regulations.

As a witness, you have the following rights:

1.  To be provided a Notice of Authorization that identifies the investigator and explains the investigator's authority and responsibility in the conducting the investigation.

2.  To have a representative present at any meeting/discussion with the investigator. The representative can advise you on how to respond to the investigator, but cannot respond for you.

3.  To receive sufficient information concerning the claim(s) and basis(es) of the complaint and circumstances under which the complaint arose in order for you to accurately respond to the questions posed by the investigator.

4.  To be provided access to documents you previously prepared or had access to, if they are necessary for you to review in order to respond to questions posed by the investigator.

5.  To review your affidavit and make corrections or other changes prior to signing the affidavit.

I HAVE READ AND UNDERSTAND MY RIGHTS AS A WITNESS IN EEO INVESTIGATIONS.

WITNESS: _William F. Kmet_____     DATE: _9-27-04_____

TAB E

**AFFIDAVIT**

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**

    **I, Jenekia J. Johnson,** hereby solemnly swear that I am employed in the position of Student Intern, grade four,  Legal Division, Federal Deposit Insurance Corporation (FDIC), 550 17th Street, NW, Washington D.C. 20429.   My race is African-American, my color is light brown, my gender is female, my date of birth is January 17, 1982 , and my religion is Christian Baptist . My first line supervisor is Catherine Spenser.

    I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint.  I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

    I have known Ms. Gibson-Michaels approximately five years.  I met Ms. Gibson-Michaels when I started working at FDIC at the FDIC 1717 H Street building.  Our relationship has been both social and professional.  Ms. Gibson-Michaels befriended me and helped me with my work and various duties.  I believe that Ms. Gibson-Michaels had befriended other Student Interns and helped them with their work and various duties.  I have not socialized with Ms. Gibson-Michaels outside of FDIC.  I am aware that Ms. Gibson-Michaels is an African-American female, skin color black.  I am not aware of Ms. Gibson-Michaels age or her religion.  I was unaware of Ms. Gibson-Michaels' EEO Complaint until my interview on September 20, 2004.

    Regarding Accepted Issue One, On Monday, April 12, 2004, I had socialized and gone to bank with FDIC Student Intern Kristian Beard. At the bank, I discovered that

*Read*

    Affiant's Initials ____

$100 was missing from a total of $120 I had in envelope.   When I got home, I made a telephone call to FDIC Security reporting a theft of $100 to FDIC Security.   I believed that Ms. Beard was possibly responsible theft of $100 since my envelope containing the $120 had been locked inside my cubicle and that Ms. Beard had access to the key.

At approximately 11:00 AM, on April 14, 2004, Ms. Gibson-Michaels called me in the office and informed that Kristian had come to see her and told her about what had happened on Monday.  Ms. Gibson-Michaels was aware of my reporting the theft of $100 and my belief that Ms. Beard was responsible for the theft.  Ms. Gibson told me that she would like to hear my side of the story.   Ms. Gibson-Michaels asked me to come to her desk. Ms. Gibson-Michaels and I had a conversation in the project room. There were no witnesses to our conversation.  Ms. Gibson-Michaels stated, in substance, that she had a degree as a Paralegal.  Ms. Gibson-Michaels said that she believed that I was lying about the missing money and that she believed that I still had the missing money.  I responded that I believed that Kristian took the money.  Ms. Gibson-Michaels responded by stating that she did not believe that Kristian took the money since Kristian was in a high risk pregnancy.  Ms. Gibson-Michaels continued by stating if Kristian had taken the money, Kristian was in more need of the money than I was, since Kristian did not have any maternity leave left.  Ms. Gibson-Michaels stated that she believed that I took the money and made a false report to FDIC.  Ms. Gibson-Michaels continued by stating that God does not like ugly and how would I like my daughter to grow up without a mother.  Ms. Gibson-Michaels stated that I was going to get ten years in jail.  Ms. Gibson-Michaels stated that if God skips punishing me, he will punish Jayda, my infant daughter.   Ms. Gibson-Michaels asked me to send an e-mail to Investigator Douglas Fahey and tell him

Affiant's Initials

that Kristian and I had found the money and that the case should be dropped. Ms. Gibson-Michaels wanted me to take out a loan from the Credit Union for Kristian. Ms. Gibson-Michaels told me to go back to my desk and think about it.

Ms. Gibson- Michaels made several additional telephone calls to me during the afternoon of April 14, 2004, regarding the theft investigation.

I was very upset about my conversations with Ms. Gibson-Michaels and went to Mr. Lantelme's office to report Ms. Gibson-Michaels' threats against me and my infant daughter. Mr. Lantelme asked me to prepare a write-up regarding my conversations with Ms. Gibson-Michaels on April 14, 2004. I did prepare a write-up regarding my conversations with Ms. Gibson-Michaels on April 14, 2004. On April 14, 2004, I e-mailed the write-up to Investigator Douglas Fahey. After proof reading the write-up, I sent an e-mail message with the corrected write-up to Mr. Fahey on April 15, 2004. I have given a copy of the e-mail message, dated April 15, 2004 that I sent to Mr. Fahey to the Investigator.

During the morning of April 15, 2004, I was interviewed by Investigator Fahey about the theft and my conversations with Ms. Gibson-Michaels. He asked me to take a hidden electronic recorder with me and engage in a conversation with Ms. Gibson-Michaels about her threats to me. He stated that if I did not take a hidden electronic recorder with me when I spoke to Ms. Gibson-Michaels, it would be Ms. Gibson-Michaels' word against mine regarding Ms. Gibson-Michaels' threats. I agreed to take the hidden electronic recorder with me when I spoke to Ms. Gibson-Michaels. Mr. Fahey cautioned me not to speak to Ms. Gibson-Michaels until he obtained the electronic recorder. After speaking to Mr. Fahey, I ran into Ms. Gibson-Michaels in the office. Ms.

*B, BC*
*VBSC*
*Not*
*Threat*

Affiant's Initials

Gibson-Michaels asked me if I had thought about what she had said previously. Not knowing what to reply, I replied in the negative.

In the afternoon of April 14, 2004, I met with Mr. Fahey. Mr. Fahey was not happy that I had bunked into Ms. Gibson-Michaels. Mr. Fahey placed the electronic recorder in my handbag and told me that tape would last approximately 40 minutes. I went to see Ms. Gibson-Michaels. Not knowing how to justify our conversation, I stated to Ms. Gibson-Michaels that I was sorry that I had lied to you because I did think about what she had said to me previously. Ms. Gibson-Michaels said that God did take me and that I was fool to confess. Ms. Gibson-Michaels stated that I should give Kristian a $300 loan that should come from my paychecks. Ms. Gibson-Michaels stated that Kristian would forgive me if I ask for forgiveness. I was so upset and nervous that I did not continue with the conversation.

Subsequently, Mr. Fahey recovered the electronic recording device from my handbag. I believe that the tape had run out.

Regarding Accepted Issue One, I have no knowledge of any type of discrimination or reprisal by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion. I have no knowledge that Ms. Gibson-Michaels was treated any differently than other FDIC employee by FDIC Officials regarding the threat investigation.

Regarding Accepted Issues Two and Three, there was talk in the office about alleged FDIC racism, but I have no personal or first hand knowledge of any type of discrimination or reprisal by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion.

Affiant's Initials

I have nothing further to add to my affidavit.

I have reviewed this statement, which consists of 5 pages, and hereby solemnly swear ( X ) affirm (    ) that it is true  and complete to the best of my knowledge and belief.  I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this ___4th___ day of _October_____ (date)

_____
Jenekia J. Johnson

Sworn and Subscribed by _____ Barry Cohen, EEO Contract

Investigator, on _10/4/04____ (date).

Affiant's Initials _____

## PRIVACY ACT NOTICE TO INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to **FDIC** activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **FDIC** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____
Signature of Interviewer

_____
Signature of Witness (person providing statement)

Date: _10/4/04_____

Place: _Washington D.C_____